No. 2504

Second Circuit

———

MAY v. YELLOW CAB CO., INC.

———

(February 3, 1928.   Opinion and Decree.)
(March 14, 1928.   Rehearing Refused.)

———

*(Syllabus by the Court)*

1. Louisiana Digest—Automobiles—Par. 4;
   4(a); Master and Servant—Par. 166.

Where a servant operating a motor truck
belonging to his master and on his
master's business stops it on a much
travelled city street and near the cen-
ter thereof on a dark and rainy night
without a tail light or other adequate
signal of its presence there, and an
automobile being carefully driven,
whose operator was unaware of the
presence of the truck, though keep-
ing as good a lookout ahead as night
and weather permitted, collides there-
with, the operator of the motor truck
will be held negligent and his employer
liable to the owner of the automobile
for the damage done thereto by the
collision.

Appeal from the First Judicial District
Court, Parish of Caddo. Hon. F. X. Rans-
dell, Judge.

Action by Lawrence L. May against Yel-
low Cab Company, Inc.

There was judgment for plaintiff and de-
fendant appealed.

Judgment affirmed.

Foster, Hall and Smith, of Shreveport,
attorneys for plaintiff, appellee.

Pugh and Boatner; Byron A. Irwin, of
Shreveport, attorneys for defendant, ap-
pellant.

STATEMENT OF THE CASE.

REYNOLDS, J.  Plaintiff sues defendant
for $421.60 damages alleged to have been
done to his automobile in a collision be-
tween it and a motor truck belonging to
defendant.  The motor truck was being
operated by a servant of defendant and on
its business and he stopped it on a much
travelled street in the City of Shreveport
and near the center of the street on
a dark and rainy night without a
tail-light or other adequate signal
to indicate its presence there and an
automobile owned and being driven by
plaintiff in a careful manner with the
plaintiff maintaining as keen a lookout as
night and weather conditions permitted,
collided with the motor truck and was
damaged.  Plaintiff alleges that in stopping
the motor truck at the time and place and
under the weather conditions mentioned
without a tail light or other adequate sig-
nal of its presence there the operator of
the truck was negligent.

Defendant denied liability and denied
that the acts of the operator of the motor
truck constituted negligence and alleged
that plaintiff was operating his automobile
at a speed prohibited by the ordinances of
the City of Shreveport; that the motor
truck was stopped on the right hand side
of the street in which it had been moving
and had a tail light, and that plaintiff
drove his automobile into it, and that the
collision was caused solely by plaintiff's
own gross fault, carelessness and negli-
gence.

On these issues the case was tried and
there was judgment in favor of plaintiff
and against defendant for the sum of two

hundred dollars, with legal interest thereon from judicial demand, and defendant appealed.

## OPINION.

Plaintiff testified that the collision occurred on Irving Place between 6:30 o'clock and 7:00 o'clock in the evening of January 8, 1925, that it was an exceedingly stormy night and the rain was falling heavily, and—

"I proceeded on Louisiana avenue to the head of Louisiana street where I was forced to stop because of the traffic ahead of me. I then turned to my left into Jordan street, slowed down, because of the fact that it was very slippery, a very slippery night, I turned to the left there and then turned to the right into Irving Place, as that is a double turn there, and then I proceeded down the middle of Irving Place, just as I do every other night, was not in a hurry, was driving along with my wife by my side, and she suddenly called out, and at the instant that she called out I became aware of the fact that there was a vehicle or something—I could not make it out—really thought it was a farm wagon with no lights on it, in front of me, and I attempted to apply my brakes but before I could do so I crashed into the back end of this obstruction, whatever it was, and the car just crumpled up. As soon as I had ascertained that my wife was not seriously hurt I got out of my car, which was directly in the middle of the street where it struck this obstruction, and looked ahead, and I saw there a baggage truck. I then asked the nigger—there were two niggers in it—I asked the nigger what he was doing parking in the middle of the street without light * * * stopping in the middle of the street, I may have said without any tail light. He looked at his light, which was not burning, and said that he thought it was.

"Q. He looked at the light and it was not burning?

"A. Yes, sir, it was not burning.

"Q. Did he make any further statements as to what he was doing with the truck parked out there?

"A. He said that he had just stopped for a moment under the arc light to read his instructions—to read the address of the house to which he was going.

"Q. I will ask you, when you got out of the car, after it was struck or after it struck the truck, what part of the street was it standing in?

"A. Practically in the center; middleways between the two curbs, and practically over the manhole, which was in the center of the street."

On cross-examination he testified:

"Q. You were paying careful attention to the road?

"A. I was.

"Q. Why was it you did not see the truck parked there as quickly as your wife did?

"A. The reason I did not see it was, the light on the windshield; the windshield had become spotted with rain-drops, and the truck had no tail-light on it whatever. The lights were dimmed because there was a car approaching me about a block distant, and its lights were dimmed; and also because of the fact that upon entering the area of light, near which this truck was standing, still, the rays of my light were reflected on it, on the raindrops on the windshield, which had the effect of killing my lights.

"Q. In other words, the conditions were such that you could hardly see through the windshield at that particular time?

"A. Due to the rain, yes; I couldn't hardly see anything, unless it had a light warning me.

"Q. Notwithstanding the fact that you could not see through your windshield, you continued to drive your car?

"A. Certainly I could see through the windshield, as well as on any other rainy night, and people drive cars on rainy nights.

"Q. You had no windshield wiper on your car?

"A. No, sir. I will state, if you will permit me, however, that I observed the tail-lights on numerous other cars on the way out, through my windshield.

"Q. Now, is it not a fact that the truck of the Yellow Cab Company, Inc., was parked almost under a street arc light?

"A. Yes, sir.

"Q. On the opposite side of the street, the left hand side of the street, with refer-

ence to the truck and where you were travelling?

"A. It was parked in the middle of the street.

"Q. But the arc light—

"A. It was on the left hand side.

"Q. It threw considerable volume of light out?

"A. Yes, sir; as much as they usually do—as much as an arc light will usually throw."

Plaintiff's wife, Mrs. Lawrence L. May, who was sitting alongside of him on the front seat of the automobile at the time of the collision, testified:

"Q. State, Mrs. May, what you observed just before the collision.

"A. Well, we were driving from downtown and on the way out; I was on the front seat of the car and we were on the right hand side of the street, going out, and I observed cars going out, and as we turned into this street out there, Irving street I think it was, it was very dark; we were going slow; I didn't see anything ahead of me until all of a sudden I seen something black and I hollered 'lookout, Lawrence' and we hit it at the same time.

"Q. Now, was there any red light about that car, that truck?

"A. I would have seen it, if there had been any.

"Q. Then, what would be your answer as to whether or not there was?

"A. There was not."

Miss Pearl Draiss, who was in the automobile with plaintiff and his wife, riding on the rear seat, testified:

"Q. Now, did you see the truck before Mr. May came in contact with it, Miss Draiss?

"A. Just immediately before.

"Q. Now, did you hear any one call out?

"A. I did.

"Q. Who was that?

"A. Mrs. May.

"Q. Did you see it before or at the time or when as to that?

"A. No, sir, I did not.

"Q. Well, I mean did you see it afterwards or at the same time, or how?

"A. I saw it just at the time she called out; when she called out I was sitting in the center of the seat and I looked down then and saw it between them, saw the truck just ahead.

"Q. Was there any tail light on that truck?

"A. There was not any burning.

"Q. There was none burning?

"A. No, sir.

"Q. About what portion of the street was that truck, at the time that the collision occurred, with reference to the side or center of the street?

"A. It was almost in the center of the street.

"Q. Did you observe Mr. May speak to this boy who was in charge of the truck?

"A. Yes, sir; immediately after he got out of the car. I heard him ask him where was his tail-light.

"Q. What did they say?

"A. They said they thought it was burning.

"Q. He said that he thought the tail-light was burning?

"A. Yes, sir.

"Q. Thought it was?

"A. Yes, sir.

"Q. Now, that was the driver of the truck?

"A. Yes, sir.

* * *

"Q. Now, what would you say as to how Mr. May was driving?

"A. Mr. May was driving very careful. We came into the center of the street, and did not have time to pick up much speed in that distance.

"Q. Now, when you turned into Irving street, about how was he driving, fast or slow?

"A. He was going very slow, going into the street, and picked up just a little, I would not say over twelve miles an hour.

* * *

"Q. At the time of the contact?

"A. Yes, sir; at the time of the contact.

"Q. I will ask you whether or not you observed the lights, both headlights and tail-lights, of other cars, in going out?

"A. Yes, sir, going out Louisiana avenue.

"Q. No difficulty about distinguishing the tail-lights, in driving along there, through the windshield?

"A. No, sir; not a bit.

"Q. Even though it was raining?

"A. Even though it was raining, I saw the tail-lights of cars on the way out.
"Q. What kind of a night was it?
"A. It was a dark, rainy night."

Defendant made no effort to contradict the testimony of these witnesses as to the facts and circumstances that brought about the collision, other than by cross-examining them, for the reason, as stated in its brief, that plaintiff had not alleged in his petition nor legally proved on the trial that the driver of the truck was engaged in discharging any duty to it at the time of the collision, for which reason evidence in disproof of that of plaintiff on these points was unnecessary. However, the Supreme Court (May vs. Yellow Cab Co., Inc., 164 La. —, 114 Sou. Reporter, 836; advance sheets, No. 14, January 21, 1928) has held that the allegations of plaintiff's petition were sufficient to entitle him to make proof that driver of the truck was acting within the scope of his employment, and we think the parking of the motor truck without a tail-light at the time and place and weather conditions was negligence on the part of the servant for the consequences of which the master is liable.

But the defendant insists that the testimony of the plaintiff and his wife and Miss Draiss shows that plaintiff himself was negligent and that his negligence was the proximate cause of the collision, contending that had he been as careful as under the conditions prevailing at the time and place as the law required him to be he would have seen the motor truck in time to avoid colliding with it even though it had no tail-light.

The evidence shows that just before the collision another automobile was approaching that of plaintiff's from the opposite direction and plaintiff put on the dimmers on his car and this shows that he was maintaining a lookout ahead.

The trial court was of the opinion that the absence of a tail-light from the motor truck was the proximate cause of the collision and we are unable to conclude that this was error.

This brings us to the question of the amount of damages done to plaintiff's automobile, as to which there is much conflict of testimony.

Arthur Erwin testified that he was an automobile mechanic employed by Wray-Dickinson Company, and that he was the owner of plaintiff's automobile, having purchased it from Wray-Dickinson Company, and—

"Q. Did you repair the car?
"A. Yes, sir.
"Q. What condition is it in now?
"A. Fine condition.
"Q. Did you put it in as good condition as it was, first class condition as it was before?
"A. Well, I would think so.
*  *  *
"Q. What did that car cost to put it in first class condition?
"A. You mean what I paid, or the work and all?
"A. No, just what it cost; the work and what price the parts cost you?
"A. About—I don't remember exactly, but something like $25.00.
"Q. Something like $25.00?
"A. Yes, sir.
"Q. Was it over $30.00?
"A. No, sir; I don't think so.
"Q. Can you positively say it was not over $35.00?
"A. Yes, sir."

E. J. Fuller testified that he was manager of the service department of Wray-Dickinson and that on behalf of that company he inspected plaintiff's automobile after the collision and gave plaintiff an estimate of $125.00 as the cost of putting the car back into condition.

The evidence shows that shortly before the collision plaintiff was offered for his

automobile the equivalent of $350.00 and another car, and that he transferred the damaged car to Wray-Dickinson Company in part payment of another that he bought from that company and was allowed $50.00 for it.

A careful reading of the conflicting evidence as to the amount of damage done to plaintiff's car does not enable us to say that the award of the lower court was excessive.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be affirmed.